## CIRCUIT COURT OF FAIRFAX COUNTY

Izadpanah

v.

Robert Hummel

January 26, 1993

Case No. (Law) 103819

BY JUDGE THOMAS A. FORTKORT

This cause came before the Court to be heard upon a single issue framed by the Honorable F. Bruce Bach on August 7, 1992. That issue is who controls Aidant Corporation. The solution to that question resides in the events of Spring 1989.

In the latter part of 1988, Mr. Izadpanah realized that his corporation was failing and sought additional capital from Robert Hummel and Lee Loevinger, principals of Federal Computer and Cardinal Financial respectively. Hummel and Loevinger agreed to provide further financing to Aidant, Inc., provided Izadpanah entered into a stock pledge agreement. In the stock pledge agreement, Izadpanah placed 200 shares of his stock in escrow and received 201 shares of common stock as additional shares. Charles Crowe was issued 101 share of common stock and Federal Computer and Cardinal Financial each received 54 preferred shares. All these shares were designated voting stock.

The financial situation of Aidant continued to deteriorate. A meeting of the Board of Directors, who at the time were Messrs. Crowe, Izadpanah, Hummel and Loevinger, was held on February 23, 1989. At that meeting, Izadpanah agreed to take a one-year leave of absence as Aidant's president and was paid $30,000.

Aidant ran a deficit in its operations according to the formula outlined in the Stock Pledge Agreement for January and February. The source of their financial statements was the company bookkeeper, Nga Agon. On March 1, 1989, Mr. Hummel declared Aidant in default by maintaining two months of negative cash flow and demanded the es-

crow agent transfer the pledged stock to Federal Computer and Cardinal Financial. The escrow agent never transferred the stock.

At the recent hearing of the parties, the evidence clearly showed that Aidant was in default under the stock pledge agreement by maintaining negative cash flows for January and February of 1989. This issue may have been moot prior to the most recent hearing, but at this point there can be no further dispute that Aidant had defaulted by the end of business on February 28, 1989. The issue in the case now revolves upon one narrow point. If the Hummel letter to the escrow agent effectively transferred Izadpanah's pledged stock to Cardinal Financial and Federal Computer, then all subsequent meetings called by Izadpanah had no quorum and all decisions made at those meetings are void. Izadpanah would have retained only his 201 shares as against the 101 shares held by Crowe, 154 held by Federal Computer, 154 held by Cardinal Financial or 32.9% of the total outstanding voting shares.

If the Hummel letter was insufficient to transfer the escrowed shares to Federal Computer and Cardinal Management then Mr. Izadpanah would retain a majority interest (65.7%) of Aidant's stock. This majority interest would have been sufficient for a quorum at the April meeting at which Messrs. Crowe, Hummel and Loevinger were ousted from the Board of Directors.

Mr. Izadpanah maintains that he had the right to vote the escrowed shares at the April meeting which he called to name new directors. Authority for this position is found in the Virginia case of *Cohen v. Big Stone Gap Iron Company*, 111 Va. 468 (1910).

In *Cohen* the plaintiff loaned money to the Union Steel Company. As collateral security, Mrs. Cohen received 1495 shares of a second company (an iron company). *Id.* Two years after the loan was made (and before it was paid off), all of the property of the iron company was sold and conveyed to Union Steel. *Id.* The stock which had been pledged was still in the name of the original owner and was voted in favor of the conveyance. The two companies then apparently merged, and in 1907 Union Steel went bankrupt. *Id.*

Mrs. Cohen sued to try to set aside the conveyance of the iron company's assets to Union Steel. *Id.* The contest was between Mrs. Cohen and the creditors of the bankrupt corporation. *Id.* The Virginia Supreme Court held that the sale was authorized, since the shares were still held in the name of the pledgor who "had the right, therefore, to vote the pledged stock at corporate meetings." *Id.* at 473.

That ruling would appear to favor Mr. Izadpanah's position. However, in *Cohen* the court also imposed a good faith requirement qualifying the general rule:

> That company . . . had the right . . . to vote the pledged stock at corporate meetings, and its acts in that form would be binding upon the appellant as to any matter with the express or implied powers of the Iron Company as between the pledgor and the pledgee, if done in good faith; and whether done in good faith or not, would be binding on the pledgee as to an innocent third party who would be prejudiced by setting aside or annulling a contract entered into by such pledgor . . . .

*Id* at 473. (Emphasis added).

In *Cohen*, the Supreme Court declined to set aside the sale in favor of Mrs. Cohen because to do so would operate to the detriment of innocent third parties, i.e., the creditors of Union Steel. *Id*. Therefore, the Court did not need to rule on the good faith issue. However, the language quoted does suggest a good faith analysis is warranted when setting aside the act on those grounds will not prejudice an innocent third party. *Cohen* suggests that when a purely internal transaction is involved, as in the present case, there is a good faith requirement. Clearly Mr. Izadpanah violated that requirement when he discharged the board which defeated a material part of his stock pledge agreement, i.e., that he would relinquish control of Aidant if it suffered two consecutive months of losses. Good faith required that Mr. Izadpanah abide by his agreement, even if the shares were wrongfully withheld from Hummel and Loevinger by the escrow agent.

The answer, then, to the question before this Court as to the control of Aidant is that after March 1, 1989, control of Aidant was in the board of Loevinger, Hummel and Crowe based on the agreement among the parties and the fact that the agent should have delivered the shares. That situation remains unchanged through the present dates as any acts taken by Izadpanah's board choices were in violation of his stock pledge agreement and he had no power to call meetings as a minority stockholder.