MACON, D. & S. R. CO. et al. v. SHAILER et al.

(Circuit Court of Appeals, Fifth Circuit. December 5, 1905.)

No. 1,504.

1. CORPORATIONS—SUITS BY STOCKHOLDER—RIGHT TO MAINTAIN.

Under equity rule 94 a stockholder cannot maintain a suit to set aside a sale of property by the corporation which was not ultra vires, on the ground of fraud on the part of the president or directors, unless his bill shows that he applied to the stockholders to take action in the matter, setting forth the efforts made by him and the cause of their failure.

[Ed. Note.—For cases in point, see vol. 12, Cent. Dig. Corporations, §§ 791–796, 816, 817.]

2. SAME—SUIT TO SET ASIDE SALE.

A minority stockholder has no standing in equity to maintain a suit to set aside an executed sale of assets of the corporation by a pledgee, made under authority given by the pledge, after maturity of the debt secured and with the approval of the officers of the corporation, where the pledge was within its powers and it is not alleged that the directors or a majority of the stockholders disapprove of the sale, or that they would not ratify the same, and especially where it appears from the evidence that since the filing of the bill the sale has been ratified and approved by the stockholders by a large majority.

Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Georgia.

The bill in this case was filed November 26, 1904, by Robert A. Shailer, a citizen of Massachusetts, as a minority stockholder of the Illinois & Georgia Improvement Company, on behalf of himself and other stockholders similarly situated, etc., to set aside a sale of the stocks and bonds of the Macon, Dublin & Savannah Railroad Company, incorporated under the laws of Georgia, made

by said improvement company to the Atlantic Coast Line Company, a corporation of the state of Connecticut, for the sum of $1,000,000, to enjoin the Coast Line Company from voting the stock or controlling the said railroad company, to appoint a receiver for the said railroad, and to foreclose the first mortgage of the said railroad company. The Illinois & Georgia Improvement Company was incorporated in the state of Illinois with a capital of $1,000,000, divided into 10,000 shares of $100 each. Shailer alleges himself to be the holder of 126 shares. To the bill Ira E. Dupree became by intervention a party plaintiff, claiming to own 40 shares. The Macon, Dublin & Savannah Railroad Company (called herein "railroad company") is a Georgia corporation owning and operating a railroad from Macon, Ga., to Vidalia, Ga. The Illinois & Georgia Improvement Company is chartered as a construction company, with power, among other things, to build railroads, receive railroad securities therefor, and sell the same, and repeat like operations of construction and dealing in securities. The improvement company, pursuant to its chartered powers, became and was at the times hereinafter stated the owner of $2,040,000 par value of the shares of the capital stock, and $1,380,000 par value of the first mortgage and $500,000 par value of the second mortgage bonds of said railroad company. Said stocks and bonds were all of the stocks and bonds of said railroad company. In order to raise money which was expended in building and equipping parts of the railroad of said railroad company, said improvement company made two loans, one for $750,000, secured by a collateral trust agreement conveying to the American Trust & Savings Bank, an Illinois corporation (called herein "Savings Bank"), $2,040,000 of the capital stock, and $1,380,000 of the first mortgage bonds of said railroad company, and one for $150,000, secured by a like agreement conveying to said savings bank the entire issue, $500,000, of second mortgage bonds of said railroad company. Said securities were delivered to said savings bank in pledge under the terms of said collateral trust agreements, and were thereafter so held by the said bank.

The debts secured were represented by a series of negotiable notes of $1,000 each, held by a number of bona fide purchasers for value before maturity, and the holders thereof were entitled to the security of the trust deed and pledge held by said savings bank. The earnings of the railroad company never were sufficient to pay the interest maturing on either issue of the bonds. By agreement with the improvement company, the coupons on said railroad company's bonds were not detached or presented for payment. The improvement company kept the interest paid up on its outstanding notes which were secured by said collateral trust and pledge. The improvement company had for a considerable time been endeavoring to sell the stocks and bonds of said railroad company. January 15, 1901, the stockholders of the improvement company, in a meeting at which complainants' stock voted affirmatively, directed the board of directors to either sell or pledge these securities to raise money. February 14, 1901, the stockholders again authorized the directors to sell these securities. The ineffectual efforts of the president to sell the securities were from time to time reported to the stockholders. In May, 1904, the loans of the improvement company were maturing, and it was necessary that something should be done to raise money to meet its debts. Its creditors had notified the improvement company that the debts could not be extended. Ineffectual efforts were made to get the stockholders to put up the money on the credit of the securities of the railroad company. The savings bank, as trustee, after waiting until September 23, 1904, filed its bill in the circuit court of Cook county, Ill., to foreclose its collateral trust agreements, alleging that disputes existed between the holders of the notes evidencing the debts secured, as to certain priorities of payment claimed by some of said holders. This bill prayed an ascertainment of said debts and the sale of the pledged securities by a public judicial sale. On September 27, 1904, G. D. Mackay, a member of the firm of Vermilye & Co., brokers, offered W. G. Elliott, who was president of the Coast Line Company, to sell to him and associates the entire stocks and bonds of said railroad company for $1,000,000 cash. Mackay was authorized to make the sale by Joy Morton, president of the improvement company, and the sale was made on September 27, 1904, at the price named.

September 28, 1904, a check for $50,000 was deposited to the order of said savings bank with the North American Trust Company in New York. October 5, 1904, a memorandum of sale was drawn up, reciting the sale of said securities to said Coast Line Company by said improvement company for $1,000,000. This was signed by the improvement company, the owner and pledgor, through its president, and a consent thereto, so far as it had any interest, was signed by said savings bank, the pledgee. October 27, 1904, the balance of said purchase money was paid. November 30, 1904, the board of directors of the improvement company ratified and approved said sale and the disposition of said securities. On October 31, 1904, the aforesaid bill, filed by the savings bank in the circuit court of Cook county, was dismissed.

The bill attacks said sale of said securities and seeks to set it aside upon the grounds, to wit, that the sale was made by the savings bank, the pledgee at private sale, at an inadequate price, and that said pledgee occupied a dual position as trustee and creditor (being the owner of some of the aforesaid notes), and especially after filing its bill in Cook county circuit court could not in equity make such sale; that the sale as made or consented to by the improvement company was illegal, because a private sale for inadequate consideration made by the president, who was also vice president of the savings bank, without authority from either the stockholders or directors of the company; that the sale was of all the assets of the improvement company, and could not be made, except by unanimous consent, as it was a practical dissolution of the company; that, if such sale was necessary to pay debts, it must be by a vote of shareholders and at public auction. It is charged that the Coast Line Company knew all the facts before it finally paid for said securities. Subsequent to the filing of the bill, to wit, on February 20, 1905, the annual meeting of the shareholders of the improvement company was held. At said meeting complainant sought to have the shareholders disapprove said sale and direct the recovery of said securities. This was voted down, and, instead thereof, the sale was in all things ratified and approved by the shareholders by a vote of 4,498 4/10 shares for, to 641 shares against; the total shares outstanding being 7,146 3/4. On July 11, 1905, the presiding judge passed an order continuing a restraining order previously issued, in force until the final hearing and refusing to appoint a receiver.

The appellants took an appeal and assign errors as follows:

"(1) Because it appears by the bill of complaint that complainant Shailer is the owner of only 126 shares, and intervener Ira E. Dupree of only 40 shares, of stock out of a total of 7,000 shares of stock in the improvement company; that the matters and things complained of set forth a sale of property as the property of said corporation; that any cause of action that may exist to set aside or revoke said sale, or in anywise interfere therewith, is a right of action belonging to said corporation; that complainant does not set forth in his said bill any demand made upon said corporation or its board of directors to bring this suit, or any good and sufficient reason in law why such demand hath not been made, neither does said bill show any effort to obtain any action on the part of the shareholders of said company in regard to the alleged wrongs complained of, and complainant therefore hath no standing in this court to maintain this suit.

"(2) Because the said matters and things complained of, to wit, the sale of said stock and securities, are not an act ultra vires of the corporation, but are acts intra vires, and the said bill of complaint doth not show that the said corporation, or its said stockholders, if application were made to them, would not ratify such act if otherwise without authority, or any effort by complainant to ascertain whether the said stockholders would or would not ratify the said act; wherefore the said complainant is without any standing in this court in equity.

"(3) Because the court erred in rendering the said order and decree of July 11, 1905, for that it appears by said bill of complaint that the acts complained of are acts within the power of said corporation, and such which, if not authorized, can be ratified by the said corporation and its stockholders, and that it appears that said sale has been fully completed and consummated and the proceeds thereof collected, and a large part applied to the corporate

uses of the said Illinois & Georgia Improvement Company, and it doth not appear that any person, save the complainants in this bill, have ever dissented therefrom, but that all the rest of said stockholders in said corporation have acquiesced in, ratified, and approved the same, and that the same is such an action as is lawful. when approved by such number of such stockholders of said corporation; wherefore the said complainants have no standing in this court.

"(4) Because the court erred in rendering the said order and decree of July 11, 1905, for that it appears by the allegations of said bill of complaint that the said securities sold were transferred to the American Trust & Savings Bank under lawful authority of said Illinois & Georgia Improvement Company, under a contract permitting the same to be sold by said savings bank, at public or private sale; that the said debt due to said savings bank by said improvement company was in default, and that the said savings bank, with the assent, consent, and knowledge of the said pledgor, sold said securities; and that the proceeds thereof were lawfully and properly applied to the payment of said debt of the said Illinois & Georgia Improvement Company, and no fact is alleged showing that the purchaser of said security had any knowledge of any defect of authority in said pledgee to sell said securities, or any objection on the part of said pledgor to their said sale. Wherefore this defendant saith that it appears upon the bill of complaint that it as said purchaser of said securities stands in the position of an innocent purchaser, for value, from the person clothed with the legal title and power of sale, and without notice of any equities which would impair power of said vendor to make said sale, and that therefore there is no equity in said bill to set aside the purchase of this defendant.

"(5) Because the court erred in rendering the said order and decree of July 11, 1905, for that the complainants seek to set aside an executed sale whereby respondent has purchased the said stock and bonds of the Macon, Dublin & Savannah Railroad Company and pledged by it to the American Trust & Savings Bank, and the said complainants have made no tender to this respondent of the said sums of money paid by it on said purchase, although averring that the same have been received by the said improvement company and have gone to the payment of its debts and other corporate purposes.

"(6) Because the court erred in rendering the said order and decree of July 11, 1905, for that the bill is multifarious and contains a misjoinder of causes of action, in this: the cause of action to set aside and annul the sale of said securities to this defendant from the American Trust & Savings Bank, together with suit to foreclose a mortgage executed to said savings bank by the Macon, Dublin & Savannah Railroad Company, and to appoint a receiver for the property of said railroad company.

"(7) Because the court erred in rendering the said order and decree of July 11, 1905, for that there is in said bill a misjoinder of parties defendant, to wit, the joinder of the Macon, Dublin & Savannah Railroad Company with the other parties defendant in said bill, the said Macon, Dublin & Savannah Railroad Company having no interest in who may be the owner or be entitled to own the stocks and bonds issued by it, and to which it has no title; and a further misjoinder of parties, to wit, the joinder of the defendants Joy Morton, J. P. Soper, E. P. Ripley, W. S. North, William A. Fuller, William P. Smith, and A. T. Ewing, against whom no relief whatever is prayed, and from whom no answer under oath or answer to interrogations is sought.

"(8) Because the court erred in rendering the said order and decree of July 11, 1905, for that the said complainant has a full, complete, and adequate remedy at law for his alleged grievances.

"(9) Because the court erred in rendering the said order and decree of July 11, 1905, for that the said bill of complaint contains no equity.

"(10) Because the court erred in rendering the said order and decree of July 11, 1905, for that the evidence showed without dispute that the sale made was a lawful sale, and that the complainants as stockholders had no right to object thereto.

"(11) Because the court erred in rendering the said order and decree of July 11, 1905, for that the evidence showed that the sale was made by au-

thority of the corporation Illinois & Georgia Improvement Company and was binding on the complainants.

"(12) Because the court erred in rendering the said order and decree of July 11, 1905, for that the evidence showed that said sale was fully ratified by the Illinois & Georgia Improvement Company before suit brought and was binding on complainants.

"(13) Because the court erred in rendering the said order and decree of July 11, 1905, for that the evidence showed that the sale of said stock, if without authority, was not void, but voidable; that no attempt was made by complainants before said bill was filed to have the Illinois & Georgia Improvement Company, its directors, or shareholders bring such suit or disaffirm said sale; and that subsequently said corporation, through its stockholders, fully and lawfully ratified the same sale.

"(14) Because the court erred in rendering the said order and decree of July 11, 1905, for that the facts in said case showed that complainant had no right to any equitable relief of any sort.

"(15) Because the court erred in rendering the said order and decree of July 11, 1905, for that the same is contrary to law.

"(16) Because the court erred in rendering the said order and decree of July 11, 1905, for that the same is contrary to the principles of equity."

W. E. Kay, Alex C. King, Minter Wimberly, and Frank H. Scott, for appellants.

Marion Erwin, M. P. Callaway, Saml. Bosworth Smith, and W. D. Carswell, for appellees.

Before PARDEE and SHELBY, Circuit Judges, and MAXEY, District Judge.

After stating the facts above, the opinion of the court was delivered by PARDEE, Circuit Judge.

The bill in this case is brought by a stockholder of an incorporated company in his own name, to prosecute and vindicate the rights of the corporation, and, of course, the ninety-fourth equity rule must be complied with or a case made showing such compliance unnecessary. The pledge to the savings bank and the subsequent sale complained of were within the chartered powers of the improvement company—in no sense ultra vires. The bill charges that the president of the improvement company, without any authority from any meeting of the stockholders, and without any authority conferred upon him at any meeting of the board of directors, ratified the sale complained of, giving details of the bargaining and ratification. The thirteenth paragraph of the bill is as follows:

"Your orator further avers and charges that during the time of the occurrence of the matters herein complained of the following named persons, named as defendants to this bill, constituted, and still constitute, the board of directors of the said improvement company, to wit: Joy Morton, president, and J. P. Soper, E. P. Ripley, W. S. North, William A. Fuller, William P. Smith, A. T. Ewing. Your orator avers and charges, on information derived from a certain bill hereinafter more particularly referred to, filed by said the American Trust & Savings Bank, as trustees for said certificate holders and in its own behalf, and on information and belief, that each and all of said persons constituting the said board of directors of the improvement company were at the time of the matters herein complained of large holders of said collateral trust certificates, and indorsers on said obligations of the said company of the said railroad company, by reason of which their individual interests as such certificate holders became antagonistic to the interests of your orator and other

stockholders of said improvement company who were not holders of said collateral trust certificates. Your orator further avers and charges that during the time of the occurrence of the matters herein complained of the said Joy Morton, president of said improvement company, was also first vice president of the said the American Trust & Savings Bank, by reason of which his interests became and were still more antagonistic and adverse to the interests of the stockholders of the improvement company."

In the nineteenth paragraph it is said:

"Your orator further avers and charges that by reason of the premises the said sale made by said the American Trust & Savings Bank of said collaterals to the said Atlantic Coast Line Company was unfair and unjust, and constitutes a fraud upon the rights of the said improvement company and upon the rights of your orator and other stockholders thereof similarly situate, and that the attempted ratification of said sale made by said Joy Morton on behalf of the said improvement company was without authority, and void."

The affidavit verifying the bill recites:

"Deponent further says that he was a shareholder of the stock of the Illinois & Georgia Improvement Company (owning the shares of said stock stated in said bill as owned by him) at the time of the transactions of which he complains in said bill, and that he still owns said stock, and that this suit is not a collusive one to confer on a court of the United States jurisdiction of a case of which he would not otherwise have cognizance."

It is claimed that these matters so alleged in connection with the whole case made by the bill dispensed the complainant from applying to the board of directors and to the stockholders for relief.

In the leading case of Hawes v. Oakland, 104 U. S. 450, 26 L. Ed. 827, which was immediately followed by the ninety-fourth equity rule, it is laid down:

"We understand that doctrine to be that to enable a stockholder in a corporation to sustain in a court of equity in his own name a suit founded on a right of action existing in the corporation itself, and in which the corporation itself is the appropriate plaintiff, there must exist as the foundation of the suit some action or threatened action of the managing board of directors or trustees of the corporation which is beyond the authority conferred on them by their charter or other source of organization; or such a fraudulent transaction completed or contemplated by the acting managers in connection with some other party, or among themselves, or with other shareholders, as will result in serious injury to the corporation, or to the interests of the other shareholders; or where the board of directors, or a majority of them, are acting for their own interest, in a manner destructive of the corporation itself, or of the rights of the other shareholders; or where the majority of shareholders themselves are oppressively and illegally pursuing a course in the name of the corporation which is in violation of the rights of the other shareholders, and which can only be restrained by the aid of a court of equity. Possibly other cases may arise in which, to prevent irremediable injury or a total failure of justice, the court would be justified in exercising its powers, but the foregoing may be regarded as an outline of the principles which govern this class of cases. But, in addition to the existence of grievances which call for this kind of relief, it is equally important that, before the shareholder is permitted in his own name to institute and conduct a litigation which usually belongs to the corporation, he should show to the satisfaction of the court that he has exhausted all the means within his reach to obtain within the corporation itself the redress of his grievances, or action in conformity to his wishes. He must make an earnest, not a simulated, effort with the managing body of the corporation to induce remedial action on their part, and this must be made apparent to the court. If time permits or has permitted, he must show, if he fails with the directors, that he has made an honest effort to obtain action

by the stockholders as a body, in the matter of which he complains. And he must show a case, if this is not done, where it could not be done, or it was not reasonable to require it."

In Corbus v. Goldmining Company, 187 U. S. 455–463, 23 Sup. Ct. 157, 160, 47 L. Ed. 256, the court, after quoting approvingly the above from Hawes v. Oakland and reciting the ninety-fourth equity rule, says:

"It must not be understood that a mere technical compliance with the foregoing rule is sufficient and precludes all inquiry as to the right of the stockholder to maintain a bill against the corporation. This court will examine the bill in its entirety and determine whether, under all the circumstances, the plaintiff has made such a showing of wrong on the part of the corporation or its officers and injury to himself as will justify the suit. The directors represent all the stockholders, and are presumed to act honestly and according to their best judgment for the interests of all. Their judgment as to any matter lawfully confided to their discretion may not lightly be challenged by any stockholder, or at his instance submitted for review to a court of equity. The directors may sometimes properly waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right. They may regard the expense of enforcing the right or the furtherance of the general business of the corporation in determining whether to waive or insist upon the right. And a court of equity may not be called upon at the appeal of any single stockholder to compel the directors or the corporation to enforce every right which it may possess, irrespective of any considerations. It is not a trifling thing for a stockholder to attempt to coerce the directors of a corporation to an act which their judgment does not approve, or to substitute his judgment for theirs. As said in Dodge v. Woolsey, 18 How. 344, 15 L. Ed. 401: 'The circumstances of each case must determine the jurisdiction of a court of equity to give the relief sought.'"

If we assume that under the facts averred in the thirteenth paragraph of the bill given above the complainant gives some reason for not applying to the managing directors of the improvement company and from setting forth with particularity his efforts to secure such action as he desires, yet we find nothing in the bill to excuse him from failure to apply to the shareholders. Counsel argues that complainant was excused from applying to the shareholders because the bill charges fraud; but the fraud charges are general and do not reach the shareholders as parties thereto. If for no other reason, it would seem that the bill should be dismissed on this ground.

If we pass by the ninety-fourth equity rule we find that the bill is without sufficient equity to warrant relief to the complainant. This want of equity is particularly pointed out in the second, third, fourth, and fifth assignments of error, each one of which seems to be well taken. There can be no doubt that under the chartered powers of the improvement company the assets acquired from the Macon, Dublin & Savannah Railroad Company could be lawfully pledged and sold as required to meet the business management or the necessities of the company. The improvement company did pledge the assets in question in the regular course of business. The bill neither attacks the pledge nor suggests bad faith in relation thereto. Three years after the pledge, and after long standing default, the pledgee, with the consent of the managers of the improvement company, sold the assets to pay the secured debt. The complaint is that this sale was

made without due corporate consent of the pledgor. The articles of pledge granted to the pledgee the power to sell on default at public or private sale, and, if they had not so provided, the sale as made, if wrongful, was one that could be validated by the ratification of the improvement company. It is not alleged that a majority or even a considerable minority of the improvement company's shareholders disapprove. As counsel well say:

"This bill is not brought to enjoin the consummation of any sale or the carrying out of an alleged unauthorized act. It avers the act complained of to have been completed, the property delivered, proceeds of sale received, and all but a small part thereof to have been applied to the payment of the corporate debts. It is brought avowedly to set aside the executed sale, no matter what the board of directors or any majority of the stockholders, however large, may think. There is no pretense in the bill that the directors and a great majority of the stockholders do not approve and ratify the sale and would so vote on a submission to them. The bill practically charges that they would approve. No averment is made why the stockholders, other than complainants or the board of directors, should not exercise their judgment and ratify the act if they deem that course wisest. The act complained of being one capable of authorization by the board or a given majority of the shareholders, a minority who would be bound by such action, if taken, cannot, under the allegations of this bill, have the sale set aside."

See Foss v. Harbottle, 2 Hare, 461–488; MacDougal v. Gardiner, 1 L. R. Ch. Div. 13; Flagg v. Manhattan Railway Co. (C. C.) 10 Fed. 413; North American Land & Timber Co. v. Watkins, 109 Fed. 104, 48 C. C. A. 254; Metcalf v. American School Furniture Co. (C. C.) 122 Fed. 115.

In MacDougal v. Gardiner, supra, James, L. J., said:

"I am of opinion that this demurrer ought to be allowed. I think it is of the utmost importance in all these companies that the rule which is well known in this court as the rule in Mozley v. Alston, 1 Phil. Ch. 790, and Lord v. Copper, Miners' Company, 2 Phil. Ch. 740, and Foss v. Harbottle, should be always adhered to; that is to say, that nothing connected with internal disputes between the shareholders on behalf of himself and others, unless there be something illegal, oppressive, or fraudulent, unless there is something ultra vires on the part of the company qua company, or on the part of the majority of the company, so that they are not fit persons to determine it, but that every litigation must be in the name of the company, if the company really desire it. Because there may be a great many wrongs committed in a company, there may be claims against directors, there may be claims against officers, there may be claims against debtors, there may be a variety of things which a company may well be entitled to complain of, but which, as a matter of good sense, they do not think it right to make the subject of litigation; and it is the company, as a company, which has to determine whether it will make anything that is wrong to the company a subject-matter of litigation, or whether it will take steps itself to prevent the wrong from being done."

And Mellish, L. J., said:

"In my opinion, if the thing complained of is a thing which in substance the majority of the company are entitled to do, or if something has been done irregularly which the majority of the company are entitled to do regularly, or if something has been done illegally which the majority of the company are entitled to do legally, there can be no use in having a litigation about it, the ultimate end of which is only that a meeting has to be called, and then ultimately the majority gets its wishes. Is it not better that the rule should be adhered to that, if it is a thing which the majority are the masters of, the majority in substance shall be entitled to have their will followed? If it is a matter of

that nature, it only comes to this: that the majority are the only persons who can complain that a thing which they are entitled to do has been done irregularly, and that, as I understand it, is what has been decided by the cases of Mozley v. Alston and Foss v. Harbottle."

Now, in this case, it appears by the record that since the bill was filed and before the hearing in the Circuit Court at an annual meeting held on February 20, 1905, after full report and discussion, the stockholders of the improvement company by a large majority in number and stock voted down a motion to disapprove the sale complained of, and, instead, voted to ratify and approve the same. The facts asserted in the bill and shown on the hearing do not show fraud nor negligence and mismanagement equivalent to fraud, nor the doing of any act ultra vires, nor even any unwise or injurious act, though as to this last opinions may differ. The pledge was valid, the debt was due, the pledgee would not renew, the pledgor was unable to pay, except through an advantageous sale of the pledged assets, and to secure and effectuate such sale the directors of the pledgor company did the best they could under the circumstances. The complainant as a minority stockholder has no just and equitable ground of complaint nor any equitable right to represent the company in a suit attacking the sale satisfactory to the majority and by which the company is unquestionably bound.

In North American Land & Timber Co. v. Watkins, supra, this court (Shelby, J.,) said:

"Even where the management of the majority appears to be unwise and injurious, equity will not interfere if such management be not dishonest or ultra vires, but will require the complaining stockholder to seek relief within the corporation. When the management is not shown to be fraudulent or dishonest, and when it is a matter of opinion whether it is wise or unwise, advantageous or disadvantageous, if the acts complained of be intra vires, there is no authority for equity to interfere. To do so would be to place the control indirectly in the hands of the minority whenever interference removes from control the officers selected by the majority. There is certainly no presumption that a minority stockholder is right, and a majority stockholder is wrong, in opinion as to the values and the management of the corporate property."

We find no equity in complainant's bill. None developed on the hearing. There is no case for an injunction to preserve the status of assets.

The interlocutory decree of the Circuit Court granting an injunction is reversed, and the cause is remanded, with instructions to dismiss the bill.